Nathan Schwed, Esq.
ZEICHNER ELLMAN & KRAUSE LLP
1211 Avenue of the Americas
New York, New York 10036
Telephone:(212) 223-0400
Facsimile: (212) 753-0396
*Counsel to the Debtors and Debtors in Possession*

Kevin J. Nash, Esq.
GOLDBERG WEPRIN FINKEL GOLDSTEIN, LLP
1501 Broadway, 22nd Floor
New York, New York 10036
Telephone: (212) 221-6944
Facsimile: (212) 221-6532
*Counsel to the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SEASONS CORPORATE LLC, *et al.*, | Case No.: 18-45284 (NHL) |
| Debtors.[1] | Jointly Administered |

**FIRST AMENDED JOINT DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE RELATING TO THE DEBTORS' FIRST AMENDED JOINT PLAN OF LIQUIDATION**

---

[1]    The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Blue Gold Equities LLC (7766), Central Avenue Market LLC (7961), Amsterdam Avenue Market LLC (7988), Wilmot Road Market LLC (8020), Seasons Express Inwood LLC (1703), Seasons Lakewood LLC (0295), Seasons Maryland LLC (1895), Seasons Clifton LLC (3331), Seasons Cleveland LLC (7367), Lawrence Supermarket LLC (8258), Upper West Side Supermarket LLC (8895), Seasons Property Management, LLC (2672) and Seasons Corporate LLC (2266) (collectively the "Debtors").  The mailing address for the Debtors, solely for purposes of notices and communications, is: 5 Doughty Boulevard, Inwood, NY.

i

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................. 1

    A.   Purpose of Disclosure Statement and Committee Recommendation .......... 1

    B.   Anticipated Distributions ............................................... 2

    C.   Substantive Consolidation .............................................. 2

    D.   Scheduling ............................................................. 3

II.     DESCRIPTION OF THE DEBTORS' BUSINESS AND
        REASONS FOR THE DEBTORS' CHAPTER 11 FILINGS ............... 5

    A.   The Debtors' Corporate Structure ....................................... 5

    B.   Reasons for the Chapter 11 Filing ...................................... 7

    C.   Committee Formation .................................................... 7

    D.   The Debtors' Secured Debt .............................................. 8

III.    MAJOR EVENTS DURING THE CHAPTER 11 CASES .................... 9

    A.   Financing Motions ...................................................... 9

    B.   The Debtors' and Committee's Professionals ............................. 9

    C.   Claims Process and Bar Date ........................................... 11

        1.   Operating Guidelines .............................................. 11

        2.   Schedules and Statements .......................................... 11

        3.   Bar Date .......................................................... 11

        4.   Sale of the Supermarkets and Other Asset Sales .................... 11

    D.   Committee Litigation with SKNY ........................................ 14

    E.   PACA Claims ........................................................... 15

IV.     SUMMARY OF THE JOINT PLAN ................................... 15

    A.   Sources and Uses of Cash .............................................. 16

    B.   Classification of Claims and Interests and Their Treatment Under the
        Joint Plan ............................................................ 16

        1.   Unclassified Claims ............................................... 16

            a.   Administrative Claims ......................................... 17

                i.   Administrative Claims - General .......................... 17

                ii.  Professional Compensation. . ............................ 17

iii.    Administrative Claims - §503(b)(9). ...............................18

b.    Priority Claims.................................................................19

c.    U.S. Trustee Fees ...........................................................19

2.    Classified Claims .................................................................19

a.    Class I - Residual Secured Claims, if any.............................20

b.    Class II - General Unsecured Claims....................................20

c.    Class III –Equity Interests...................................................21

C.    Means for Execution of the Plan..................................................21

1.    Disbursing Agent and Disbursing Agent Reserve ...........................21

D.    Procedure for Determination of Claims .......................................22

1.    Objections to Claims ............................................................22

2.    Treatment of Disputed Claims .................................................22

3.    Settlement of Claims.............................................................23

4.    Post-Effective Date Professional Compensation and
       Reimbursement Claims..........................................................23

E.    Treatment of Executory Contracts ..............................................23

1.    Background.    .....................................................................23

2.    Executory Contracts and Unexpired Leases.  . ..............................24

3.    Rejection Claims.   ...............................................................24

F.    Other Provisions......................................................................24

1.    Term of Injunctions or Stays...................................................24

2.    Exculpation ........................................................................25

3.    No Further Pursuit of Avoidance Actions ........................................25

4.    Dissolution of Debtors ...........................................................26

5.    Modification of The Joint Plan ........................................................26

6.    Closing of the Case ...............................................................26

7.    Payment of Statutory Fees and Filing of Quarterly Reports.............26

G.    Retention Of Jurisdiction .........................................................27

V.    **CONFIRMING THE PLAN** ................................................................28

A.    Parties in Interest Entitled to Vote..............................................28

B.    Requirements for Confirmation .................................................28

1.    Classification of Claims and Interests...............................................29

2.    Voting and Acceptance of the Joint Plan ..........................................29

3.    <u>Best Interests Test</u> ............................................................... 30

4.    <u>The Feasibility Test</u> .............................................................. 30

5.    <u>Requirement for Accepting Class</u> ....................................... 31

6.    <u>Other Requirements of Section 1129</u> ................................. 31

VI.    **<u>RECOMMENDATION AND CONCLUSION</u>** .................................. 31

## I.    INTRODUCTION

### A.    <u>Purpose of Disclosure Statement and Committee Recommendation</u>

This Joint Disclosure Statement and Joint Plan of Liquidation, each dated August 17, 2020 (the "Joint Plan"), together with the accompanying ballots and related materials are being provided by the Debtors and the Official Committee of Unsecured Creditors (the "Committee" and, together with the Debtors, the "Joint Proponents") to the holders of claims and interests pursuant to Sections 1125 and 1126 of the Bankruptcy Code.

By order dated October __, 2020, the Bankruptcy Court approved this Disclosure Statement as containing adequate information to permit the holders of claims and interests to make a reasonably informed decision in exercising their right to vote on the Joint Plan.  Approval of the Disclosure Statement by the Bankruptcy Court, however, does not constitute a determination of the merits of the Joint Plan. Instead that decision rests with the creditors which vote to either accept or reject the Joint Plan.

While there has been no independent audit of the information contained in this Disclosure Statement, the Joint Proponents have done their best to provide creditors with the most current information available.  If any inconsistency exists between the Joint Plan and the Disclosure Statement, the terms of the Joint Plan are controlling.  Additionally, holders of claims and interests should not construe the contents of this Disclosure Statement as providing any legal, business, financial or tax advice.

**THE DEBTORS AND THE COMMITTEE BELIEVE THAT THE JOINT PLAN WILL ENABLE THE CONCLUSION OF THE BANKRUPTCY CASES IN THE MOST EFFICIENT MANNER POSSIBLE, WHILE PROVIDING UNSECURED CREDITORS WITH A DIVIDEND OF APPROXIMATELY FIVE (5%) PERCENT OF PROJECTED ALLOWED CLAIMS.  INDEED, THE DEBTORS AND THE COMMITTEE FURTHER BELIEVE THAT APPROVAL OF THE JOINT PLAN PRESENTS A POSITIVE OUTCOME WITHOUT FURTHER LITIGATION OR ADDITIONAL ADMINISTRATIVE**

**COST.  FOR THESE <u>REASONS</u>, THE COMMITTEE, WHICH HAS BEEN ACTIVE IN ALL ASPECTS OF THE CHAPTER 11 CASES, JOINS WITH THE DEBTORS IN RECOMMENDING CREDITORS TO VOTE FAVORABLY ON THE JOINT PLAN.**

### B.    <u>Anticipated Distributions</u>

The Joint Proponents anticipate that various purported Secured Claims (including large Secured Claims filed byBank United and Supersol) will be reclassified as General Unsecured Claims (Class II), and that creditors holding General Unsecured Claims will receive a distribution equal to approximately 5% of their Allowed Claims.    The projected distributions may be lower depending on the final outcome of claims objections, but the Joint Proponents are committed to reaching these projections.  Prior to the Confirmation Hearing, the Joint Proponents plan to file a distribution schedule showing the anticipated distributions to the holders of General Unsecured Claims.

### C.    <u>Substantive Consolidation</u>

The Plan contemplates that all of the various Chapter 11 cases shall be substantively consolidated by virtue of confirmation of the Plan.  Substantive consolidation is an equitable doctrine which allows the Bankruptcy Court to consolidate affiliate debtors into a single bankruptcy estate for purposes of implementing the Plan.  Substantive consolidation effectivity means that all of the net sale proceeds generated from the sale of the supermarkets shall be distributed to all creditors <u>without</u> specific allocation as to a particular store.  Each creditor will have a single claim against all of the Debtors even if multiple claims were filed separately in the underlying Chapter 11 cases.  Under applicable law, the standards for substantive consolidation relate primarily to whether creditors dealt with the Debtors as a single economic unit and whether the affairs of the Debtors are so entangled that consolidation will benefit all creditors.  Because virtually all revenue generated by each of the individual supermarkets was upstreamed on a regular basis to the corporate parent and then commingled to pay for the expenses of the supermarkets, the Debtors and Committee

believe that substantive consolidation is appropriate.  <u>Importantly, any creditor which believes that substantive consolidation is not appropriate may voice opposition in the form of an objection to confirmation of the Plan</u>.  The Court will then consider any objections to substantive consolidation as part of the confirmation hearing.

### D.    <u>Scheduling</u>

On September 16, 2018 (the "Main Petition Date"), most of the Debtors first sought Chapter 11 relief, including Seasons Corporate LLC, Blue Gold Equities LLC, Central Avenue Market LLC, Amsterdam Avenue Market LLC, Wilmot Road Market LLC, Seasons Express Inwood LLC, Seasons Lakewood LLC , Seasons Maryland LLC, Seasons Clifton LLC, Seasons Cleveland LLC, Lawrence Supermarket LLC and Upper West Side Supermarket LLC (collectively, the "Initial Debtors"), which each filed a petition for relief under chapter 11 of Title 11, United States Code (the "Bankruptcy Code").[2]  All of the Chapter 11 cases are being jointly administered pursuant to Bankruptcy Court Order dated September 18, 2018 (ECF No. 19).

On November 14, 2018 (the "Maryland Petition Date" and, together with the Main Petition Date, the "Petition Dates"), Seasons Property Management, LLC (the "Maryland Debtor" and, together with the Initial Debtors, the "Debtors") filed a petition for relief under Chapter 11 of the Bankruptcy Code. Since the filing of their respective petitions, the Debtors have remained in possession of their assets and managed their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

---

[2]    On August 28, 2018, three (3) creditors had filed an involuntary Chapter 7 petition against Wilmot Road Market LLC ("Wilmot") in the United States Bankruptcy Court for the Southern District of New York.  That case was subsequently transferred to this Court and later dismissed, on a motion by Wilmot, pursuant to order dated May 8, 2019.

Before the Chapter 11 filings, the firm of Getzler Henrich & Associates LLC was engaged to act as the Debtors' chief restructuring officer, replacing Zvi Bloom from active management. Thus, effort was made by the Debtors early on to achieve a level of independence from the outset of the Chapter 11 cases, which carried forward through the sale and confirmation process, particularly with the Committee's strong involvement.

A hearing to consider confirmation of the Joint Plan (the **"**Confirmation Hearing") **will be held remotely on December 8, 2020, at 10:00 a.m. Eastern Standard Time,** before the Honorable Nancy H. Lord, United States Bankruptcy Judge.  At the Confirmation Hearing, the Bankruptcy Court will consider whether the Joint Plan satisfies the various requirements under Section 1129 of the Bankruptcy Code for confirmation and approval.

The Bankruptcy Court has directed that objections, if any, to confirmation of the Joint Plan must be filed and served so they are received on or before, **December 1**, **2020 at 5:00 p.m., Eastern Standard Time**, in the manner memorialized in the accompanying Order scheduling the Confirmation Hearing.

To be counted, your Ballot must be duly completed, executed and delivered by email to **Nathan Schwed (nschwed@zeklaw.com)** and **Kevin J. Nash (knash@gwfglaw.com)** so as be received by them by **5:00 p.m., Eastern Standard Time, on, November 27, 2020.** If your Ballot is not timely received, it may not be counted in determining whether the Joint Plan has been accepted. You are urged to carefully review the contents of the Joint Plan and Disclosure Statement, including all exhibits annexed thereto, before making your decision to vote to accept or reject the Joint Plan. If your Claim is impaired (as defined in this Disclosure Statement) by the Joint Plan, you are entitled to vote to accept or reject the Joint Plan.

## II.    DESCRIPTION OF THE DEBTORS' BUSINESS AND
REASONS FOR THE DEBTORS' CHAPTER 11 FILINGS

### A.    The Debtors' Corporate Structure

Seasons Corporate LLC ("Corporate") is a stock-holding company and the 100% equity member of each of the other operating Debtors.  The primary holders of the membership interests in Corporate are Blue Wolf Investment LLC (whose principals are Zvi Bloom and Mayer Gold) and SKNY LLC ("SKNY").[3]

SKNY also functioned as the Debtors' lead pre-petition and post-petition lender and was part of the group which made a stalking horse bid to purchase the bulk of the Debtors' supermarkets.  As such, SKNY was a key player in the Chapter 11 cases and became the focus of an adversary proceeding commenced by the Committee, which was settled on March 26, 2020 (ECF No. 401).

Historically, the Debtors were engaged in the business of operating kosher supermarkets at eight locations in the Northeast.  As of the Main Petition Date, the Debtors were in the early stages of construction of a ninth store (in Cleveland) and relocation of the Scarsdale location. Certain of the Debtors operated the stores (the "Operating Entities") and others were the tenants under leases for the store properties (the "Tenant Entities").[4]  Virtually all revenue generated by each of the Operating Entities was "upstreamed" on a regular basis to Corporate, which then used the sale proceeds and revenues received from the stores to pay for all of the expenses of the Operating Entities and the Tenant Entities without segregation on a consolidated basis.  Hence, the Joint Plan provides for the substantive consolidation of the Chapter 11 cases, such that all of the

---

[3]    Several other investors hold small interests in Corporate, each less than 5%.

[4]    The Maryland Debtor owned property contiguous to the Baltimore store which was used as a parking lot for the store.

residual net proceeds from the sale of the Debtors' supermarket assets (after payment of allowed administrative expense and priority claims) will be distributed to the general creditor body in accordance with the Distribution Schedule on a combined basis without allocation as to a particular store location based upon a single combined claim against all of the Debtors.

Historically, the first four (4) of the Debtors' stores (in Queens, Manhattan, Scarsdale and Lawrence) were acquired by Bloom and Gold in 2010 and 2011 from the former operator, Supersol, and the names of the stores were changed to "Seasons." The purchase price for the acquisitions was originally set forth in several purchase agreements.  In 2013, the payment obligation was recast and converted into a "consulting fee" which required the Debtors to pay $18.8 million over a period of nine (9) years. Thereafter, additional Seasons stores were opened in Lakewood, Clifton, Baltimore and Inwood.  At the time of the Chapter 11 filings, the Debtors had entered into a lease for, and were commencing construction on, a new store in Cleveland. In addition, following substantial delays and investment, the Debtor was also on the verge of opening a new store in Scarsdale (to replace the smaller location from which it had been operating for several prior years).

B.       **Reasons for the Chapter 11 Filing**

Unfortunately, the Debtors experienced significant delays and cost-overruns for each new store and the root cause for the bankruptcy was the cash drain and adverse impact of over-expansion.  Although most of the stores were profitable, they could not sustain the cash flow drain caused by the business expansion.  Over time, the Debtors went into default on their obligations to Supersol, resulting in an arbitration award and judgement in the sum of $8.3 million.  A large unsecured credit facility of $10.0 million obtained from Bank United helped the Debtors' cash flow for a while, but that was relatively short-lived, as the development/construction costs spun out of control in 2017 and 2018.

By mid-2018, Supersol restrained certain operating accounts, while Bank United declared a default based on the Supersol judgment.  A partial payment of $600,000 to Supersol and set-off of another $600,000 by Bank United caused a dramatic reduction in the Debtors' available cash.  Suppliers began to require COD payments and attempts to obtain funding to restock the stores were unsuccessful.  After negotiations with Supersol, as well as efforts to obtain additional financing or a sale of the business failed, Supersol caused the filing of an involuntary petition against Wilmot. For a period of several weeks, the Debtors continued with their efforts to reach a resolution with Supersol.  When those efforts failed, the Debtors filed the main Petitions with the goal of selling the supermarkets to achieve going concern value.

C.       **Committee Formation**

Early on during the Chapter 11 cases, the Office of the United States Trustee organized a five (5) member Committee consisting of various concessionaires, trade vendors and Supersol.  The Committee was proactive, taking the lead on generating a competitive bid for the Debtors' supermarket assets.   Initially, the Committee was very concerned that the bankruptcy was

administratively insolvent. Thus, the Committee did its level best to maximize assets by promoting an alternative buyer in combination with hard negotiations relating to cure lease, equipment, and PACA claims that were settled and paid. Ultimately, the Committee was gratified that a competitive bid emerged for the supermarkets, and the auction generated almost $4.0 million of additional proceeds over the initial proposal. Indeed, general creditors now stand to receive a dividend of approximately five (5%) percent on account of projected allowed claims. While this dividend is modest, it is far larger than what was anticipated at the start of the bankruptcy process.

**D.    The Debtors' Secured Debt**

From time to time, the Debtors financed their operations through a series of loans from SKNY, an entity formed by Robert Klein and his family trust. Mr. Klein was a Cleveland based financier who acquired a 15% preferred Class B membership interest in the Debtors for $5 million, and organized SKNY for the purposes of holding his investment. Mr. Klein passed away unexpectedly in 2018. In the months leading up to the Chapter 11 filings, SKNY made a series of loans to the Debtors in three tranches itemized as follows:

|            |            |
|------------|------------|
| 02/16/2018 | $1,000,000 |
| 03/06/2018 | $1,000,000 |
| 09/05/2018 | $660,795   |

The last tranche of lending was done just two weeks before the Chapter 11 filings and included advances for certain accrued payrolls and professional retainers.

SKNY filed a pre-petition claim in the sum of $3,472,711.38, plus accruing interest, fees and costs. As noted, the scope of SKNY's pre-petition lien and security interest became subject to an investigation by the Committee and ensuing litigation, which was settled by the receipt of $650,000 by the Debtors' estate from an escrow. The settlement with SKNY was also made with

the view that there would be no further litigation and the Debtors would move forward to confirm the Plan.

### III.    MAJOR EVENTS DURING THE CHAPTER 11 CASES

### A.    Financing Motions

Heading into bankruptcy, the Debtors realized that the only hope for providing a distribution to creditors and maintaining the jobs of their several hundred employees was to arrange for an auction sale of their assets in a manner and timeframe that would limit losses and provide the best opportunity to maximize value. Even before the actual fillings, the Debtors negotiated and entered into an agreement with SKNY for so-called DIP financing of up to $5.7 million, as well as for consensual use of cash collateral. However, SKNY was only willing to provide DIP financing if it was given the opportunity to be the stalking horse bidder at the auction.  Accordingly, the Debtors and SKNY negotiated and entered into an Asset Purchase Agreement and proposed bidding procedures.  The Committee weighed in heavily on these matters.  Yet, even before the Committee's organization, the Court refused to grant any post-petition financing which had the effect of "rolling-up" or elevating the SKNY pre-petition liens as part of its post-petition liens.  The DIP financing and use of cash collateral were approved (in stages over a period of several weeks), initially on an interim basis on September 18, 2018 (ECF No. 14) and subsequently on a final basis on October 18, 2018 (ECF No. 131).  Under the DIP financing, the Debtors borrowed the total sum of $6.5 million, which helped maintain the stores pending the sale.

### B.    The Debtors' and Committee's Professionals

During the course of the Chapter 11 case, both the Debtor and the Committee retained various professionals, including attorneys and financial advisors, to assist in carrying out their duties.  To date, the various Professionals have been paid 80% of their requested fees and

100% of their requested disbursements pursuant to an Interim Compensation Order dated November 29, 2018 (ECF No. 217).  The Joint Plan provides that, no later than 30 days after the Confirmation Date, Professionals shall be required to file their final fee applications for Professional Compensation covering final approval of all amounts paid under the Interim Compensation Order, holdbacks, plus all other accrued and unpaid professional fees and expenses through the Confirmation Hearing.

Projected fees of Professionals are as follows:

| Professional | Actual and Projected Total Fees through Confirmation | Estimated Balance Of Professional Fees to be paid on the Effective Date |
|---|---|---|
| Zeichner Ellman & Krause LLP, Debtors' counsel | $675,000 | $160,000 |
| Getzler Henrich & Associates LLC, Debtors' financial advisor | $1,100,000 | $210,000 |
| Mitchell R. Ackerman CPA P.C. and Aaron H. Rubin & Associates, L.P., Debtors' Accountants | $180,000 | $45,000 |
| Goldberg Weprin Finkel Goldstein LLP, Committee counsel | $275,000 | $135,000 |
| Argus Management Corp., Committee financial advisor | $250,000 | $75,000 |
| Total | $2,480,000 | $625,000 |

### C.     Claims Process and Bar Date

#### 1.    Operating Guidelines

Upon the Petition Date, the Debtors became bound by the Operating Guidelines and Reporting Requirements for Chapter 11 Cases (the "Operating Guidelines"). The Debtors have fulfilled and continue to fulfill their obligations under the Operating Guidelines, except to the extent modified by Court Order.

#### 2.    Schedules and Statements

The Debtors filed with the Bankruptcy Court their Schedules and Statement of Financial Affairs (the "Schedules") on a consolidated basis. According to the Debtors' Schedules, as of the Petition Date, the Debtors had secured liabilities in the approximate amount of $17,363,822.00; unsecured priority liabilities (i.e. unpaid wages, vacation and taxes) in the approximate amount of $9,080.14; and unsecured non-priority liabilities in the approximate amount of $21,557,983.33.

#### 3.    Bar Date

The Bankruptcy Court previously established June 7, 2019 as the general bar date for filing pre-petition proofs of Claim, and July 25, 2019 as the Administrative Bar Date. Any Holder of a Claim against the Debtors who was required to, but failed to file a proof of Claim on or before the respective Bar Dates, will be challenged as untimely pursuant to the contemplated claims objection process and are not included in the Distribution Schedule.

#### 4.    Sale of the Supermarkets and Other Asset Sales

The main focus of the Chapter 11 cases was to pursue a sale of the Debtors' Supermarkets. Immediately after their Chapter 11 filings, the Debtors filed a motion seeking approval of a stalking horse proposal from SKNY to purchase the Supermarkets for $10,025,000 plus payment of cure cost relating to the leases/agreements for the stores and equipment assumed by the purchaser (the

"Cure Costs").  The Debtors faced multiple objections to their motions to sell their assets and received an offer from another party, DC Brothers, to be the stalking horse bidder.  Following several hearings and negotiations, DC Brothers joined with SKNY to present a modified stalking horse bid to acquire all eight (8) stores at a price of $10,250,000 plus up to $3,450,000 of Cure Costs.   On October 18, 2018, the Bankruptcy Court entered an order, inter alia, approving the modified asset purchase agreement (the "APA") between the Debtors and SSNS Express LLC ("SSNS"), the entity formed by SKNY and DC Brothers to bid on the Debtors' assets, approving Bidding Procedures for the sale of the Debtors' assets and scheduling an auction for 10:00 a.m. on November 28, 2018 at the offices of ZEK (the "Sale Order").  The APA required the Debtors to waive any avoidance claims under Chapter 5 of the Bankruptcy Code, other than claims against insiders.  The APA also provided that all executory contracts not expressly assumed by the purchaser are deemed rejected.

At the auction on November 28, 2019, a third party presented an all cash bid for only five (5) of the Debtors' stores (in Lawrence, Inwood, Queens, Scarsdale and Lakewood) in the amount of $14.5 million (which required the Debtors to pay Cure Costs).  SSNS then switched its bid to all cash as well for the same five (5) stores and the parties engaged in active bidding.  At the end of the auction, SSNS was the successful bidder at an all cash price of $17 million.

$6,704,786.95 of the proceeds of sale was used to satisfy the DIP loan.  Because the Committee had commenced an adversary proceeding against SKNY seeking to avoid part of its pre-petition secured claim, the parties agreed to escrow $4 million to cover the amount due on the pre-petition loan as well as potential legal fees incurred by SKNY in litigating with the Committee. Additionally, $700,000 was escrowed to cover any potential variance in the store inventories from

the amount of inventory required under the purchase agreement, and $900,000 was escrowed to cover any potential unpaid mechanics liens against the Scarsdale store property.

Subsequent reconciliation of open items between the Debtors and SSNS resulted in the Debtors recovering $681,181 out of the $700,000 inventory escrow. In addition, the Debtors were required to pay mechanics liens in the amount of $420,319, leaving a balance of $479,680 out of the $900,000 mechanics lien escrow. Finally, following court-ordered mediation, the Committee and SKNY settled their dispute regarding SKNY's pre-petition secured claim pursuant to which SKNY received $3,350,000 of the $4 million escrow to pay for its pre-petition claim, and the balance of $650,000 was disbursed to the Debtors.

Subsequent to the auction, the Debtors' attempts to generate additional funds from sales of the remaining three (3) stores were unsuccessful. The cure costs and lease costs scared away potential purchasers.[5] Nevertheless, in an attempt to save the jobs of the numerous employees working at the Clifton and Baltimore stores, the Debtors' counsel negotiated with the landlords and equipment lenders to reduce cure amounts enough to make the stores more attractive. After extensive negotiations, the Clifton landlord agreed to a substantial reduction in the cure amount and to modified lease terms that induced SSNS to assume the Clifton store lease and maintain operations. Similarly, the Debtors' counsel engaged in extensive negotiations with the landlord and the equipment lender for the Baltimore store, as well as with the holder of the mortgage on the contiguous property owned by the Maryland Debtor, and achieved substantial concessions sufficient to induce the operator of a Concession at the Baltimore store to assume the lease and the equipment obligations and maintain operations. In the process, the Debtors avoided paying certain

---

[5]    The New York store, by far the smallest of the stores with the fewest employees, was unattractive for other reasons as well.

post-petition rent obligations and recovered the $100,000 deposit provided under the Baltimore store lease.

## D.      **Committee Litigation with SKNY**

The SKNY secured claims had their genesis in a series of pre-petition loans made over a period of seven months during the lead-up to the filings of the Chapter 11 petitions on September 18, 2018.  Because SKNY is an insider, the Committee was charged with the responsibility of investigating SKNY's secured claims.

Following Rule 2004 discovery, the Committee filed an adversary proceeding challenging various aspects of SKNY's lien and security on November 21, 2018 primarily based on perceived deficiencies in the underlying documentation.

With the adversary proceeding pending at the time of the closing on the sale of the supermarkets, the sum of $4.0 million was set aside from the sale proceeds and placed into a segregated escrow account (the "Escrow") to cover the total amount of SKNY's secured claims, plus ongoing interest, accruing fees, other charges and expenses.

Following motion practice and additional discovery, the parties agreed to mediation, which resulted in a negotiated settlement of the Committee's claims against SKNY, which was approved by Order entered March 27, 2020 (the "Settlement").  Under the terms of the approved Settlement, the Debtors' estate has received the sum of $650,000 from the Escrow, which funds are now available for distribution to creditors under the Plan.  The balance of the funds in the Escrow were retained by SKNY in full satisfaction of its pre-petition secured claims, including all principal, interest, fees and other charges and expenses.

In reaching the Settlement, the Committee was cognizant that it potentially faced a "no-win" situation arising from the practical fact that SKNY's secured claims continued to accrue

interest, the amount of which would eventually overtake the benefit of any corresponding reduction in the amount of the claims that might be obtained from further litigation. In this regard, the Settlement provides the Debtors' estates with a recovery against SKNY, while minimizing further legal expense and the prospect of continuing interest and fees during the pendency of the adversary proceeding that would have eaten away at any recovery simply by virtue of the passage of time.

### E.   PACA Claims

At the onset of the Chapter 11 case, the Debtors were indebted to certain vendors under PACA (the Perishable Agricultural Commodities Act). Certain PACA creditors filed motions to compel the Debtors to pay their claims. The motions were resolved by an order dated October 18, 2018 (the "PACA Order") which authorized the Debtors to make payment to PACA creditors who submitted documentation supporting their claims within 10 days of entry of the PACA Order. Pursuant thereto, the Debtors made payment to the PACA creditors who submitted supporting documentation. In addition, the Committee negotiated settlement agreements with several other PACA creditors who timely filed claims against the Debtors. The Committee has taken the position that any additional PACA claims are time-barred.

### IV.   <u>SUMMARY OF THE JOINT PLAN</u>

A summary of the sources and uses of cash to be distributed under the Joint Plan is as follows:

A.      **Sources and Uses of Cash**

|  | Amount |
|---|---|
| Projected Net Distributable Cash |  |
| Net proceeds from liquidation of assets after payment of SKNY secured claim, PACA claims, liens and administrative costs | $2,320,000 |
| SKNY Settlement | $650,000.00 |
| Total Projected Cash Available | $2,970,000 |
|  |  |
| Monies to be Distributed under the Plan |  |
| Professional Fee Holdbacks and Projected Professional Fees through Confirmation | $625,000 |
| Wind-Down Expenses, including U.S. Trustee Fees | $300,000 |
| Administration Expense Claims, including Section 503(b)(9) | $100,000 |
| Residual Secured Claims, if any | $0.00 |
| Priority Claims | $100,000 |
| Projected balance remaining for projected 5% Dividend to General Unsecured Claims | $1,845,000 |

B.      **Classification of Claims and Interests and Their Treatment Under the Joint Plan**

The Joint Plan classifies Claims and Equity Interests into four (4) Classes, and also provides for payment of Allowed Administrative Expenses and Priority Claims.  For each Class, the Joint Plan states whether the Claims or Equity Interests are impaired and whether Holders of the Claims or Equity Interests will receive various types of distributions under the Joint Plan. The Classes and payments to be made and treatment proposed to be accorded to Allowed Claims of each Class under the Joint Plan are summarized and described below. After Confirmation and upon the occurrence of the Effective Date, the Joint Plan binds the Debtors, any creditor and equity security Holder whether or not such creditor or equity security Holder has accepted the Joint Plan, and the Debtors shall be discharged of liability for the payment of debts to the extent specified in 11 U.S.C. §1141.

1.      **Unclassified Claims**

Pursuant to section 1123(a)(1) of the Bankruptcy Code, claims of a kind specified in Sections 507(a)(1) or (8) of the Bankruptcy Code are not to be designated in a class. Thus, Administrative Claims and Priority Claims against the Debtors shall be treated separately as unclassified Claims.

a.      **Administrative Claims**

Administrative expenses are claims for fees, costs or expenses of administering the Debtors' Chapter 11 Cases which are allowed under Code Section 507(a)(1), including all professional compensation requests pursuant to Sections 330 and 331 of the Code. The Code requires that all administrative expenses including fees payable to the Bankruptcy Court and the Office of the United States Trustee which were incurred during the pendency of the case must be paid on the Effective Date of the Joint Plan, unless a particular claimant agrees to a different treatment.

i.      **Administrative Claims - General**. All trade and service debts and obligations incurred in the normal course of business by the Debtors during the Chapter 11 Case, to the extent allowed, excluding Court Orders awarding professional fees, shall receive a cash dividend from Distributable Cash equal to such Allowed Administrative Claim on the Distribution Date, or an earlier date following entry of a Final Order allowing such Administrative Claim, or as soon thereafter as is practicable.  To date, there have been no requests for payment of Administrative Claims, other than Claims of Professionals and Claims under Section 503(b)(9).

ii.      **Professional Compensation**.  The Debtors' and Committee's respective professionals shall each file a final fee application for Professional Compensation covering final approval of all amounts paid under the Interim Compensation Order, holdbacks, plus all other accrued and unpaid professional fees and expenses through the Confirmation

Hearing. Such applications shall be filed no later than thirty (30) days after the Confirmation Date. All Professional Compensation shall be paid in full from Distributable Cash upon entry of an Order of the Bankruptcy Court approving the same after notice and a hearing in compliance with the Bankruptcy Code and Rules. These Claims are estimated to be approximately $500,000, net of retainers, inclusive of anticipated fees and expenses of Chapter 11 Professionals through the Effective Date. To date, the Debtors have paid approximately $2,360,000 to the Debtors' and Committee's Professionals for Professional Compensation and Reimbursement Claims. Based on information provided by the Debtors' and Committee's professionals, the Debtors estimate that the Professionals will seek total additional payments of approximately $125,000 through the Effective Date. The Debtors and the Committee reserve the right to object to all Administrative Claims.

    iii. **Administrative Claims - §503(b)(9)**. Section 503(b)(9) affords an Administrative Claim to a seller of goods, where the goods were received by the debtor within twenty (20) days before the date of commencement of a case in which the goods have been sold to the debtor in the ordinary course of such debtor's business. A total of 26 claims under §503(b)(9) have been filed seeking an aggregate sum of $150,000. The Debtors and the Committee believe that many of these claims do not qualify for treatment as 503(b)(9) claims and reserve the right to object to all Request for Payment of an Administrative Expense pursuant to §503(b)(9). The Debtors and Committee believe these claims will ultimately be less than $100,000.

      b.      **Priority Claims**

Priority Claims includes claims of taxing authorities and Claims under 507(a)(4) for wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual during 180 days before the Petition Date. A total of 16 Priority Claims have been filed seeking an aggregate sum of $170,000. Each Holder of an Allowed Priority Claim shall receive a cash dividend from Distributable Cash equal to such Allowed Priority Claim on the Distribution Date or promptly after the entry of a Final Order allowing such Priority Claim, to the extent that the Claim is in dispute as of the Confirmation Date. The Debtors and the Committee believe that many of these claims do not qualify for treatment as priority claims and reserve the right to object to all Priority Claims. The Debtors and Committee believe these claims will ultimately be less than $100,000.

      c.      **U.S. Trustee Fees**

The Debtors shall continue to pay all outstanding UST Fees on an ongoing basis until a Final Decree is entered closing the Chapter 11 Cases.

      2.      **Classified Claims**

The following table designates the Classes of Claims and Equity Interest and specifies which Classes are: (i) impaired or unimpaired by the Joint Plan; (ii) entitled to vote to accept or reject the Joint Plan in accordance with Section 1126 of the Bankruptcy Code; and (iii) deemed to accept or reject the Joint Plan.

| Summary of Classification and Treatment of Filed Claims and Equity Interests | | | |
|---|---|---|---|
| **Class** | **Type of Claim/Category** | **Treatment** | **Voting Rights** |
| I | Residual Secured Claims, if any | Unimpaired/Full payment as applicable | Deemed to Accept |
| II | General Unsecured Claims filed against all Debtors, including all vendor claims, | Impaired/ Pro Rata dividend | Entitled to vote |

| | service provider claims, lease rejection claims, and deficiency claims. | | |
|---|---|---|---|
| III | Equity Interests | Impaired | Not Applicable |

a.    **Class I - Residual Secured Claims, if any.**

Because the allowed secured claims of SKNY, as settled and compromised, were paid and satisfied in full in conjunction with the sale of the Debtors' supermarkets, the Joint Proponents do not believe that there is any remaining valid secured debt left to be paid under the Plan.  As noted above, purported secured claims have been asserted by L&N Consulting, Supersol Ltd. and Bank United N.A.  These Claims shall all be the subject of objections to be reclassified as General Unsecured Claims, and allowed in the respective total amounts of $8.2 million, $0 and $8.8 million.  Indeed, these claims make up the bulk of the Class II General Unsecured Creditors' claims.

Nevertheless, the Joint Plan recognizes the possibility that miscellaneous residual secured claims may exist.  Thus, to the extent that a residual secured claim is allowed, the holder thereof shall receive a cash dividend in the full amount of such allowed claim from Distributable Cash on the Distribution Date.

b.    **Class II - General Unsecured Claims.**

Class II is the primary class of claims under the Joint Plan, representing all Allowed General Unsecured Claims against the Debtors. For purposes of the Joint Plan, if a creditor filed multiple claims in the various individual cases, only one claim shall be allowed.  Indeed, duplicate claims shall be adjusted and reconciled during the Claims review process.

Each holder of an Allowed General Unsecured Claim shall receive, in full and complete satisfaction, settlement and release of such holder's Allowed General Unsecured Claim, a *pro rata* payment computed and calculated from the remaining Distributable Cash (after

payment of Administrative Claims, Priority Claims, Class I Claims, and creation of reserves) divided by the total amount of Allowed General Unsecured Claims.  The *pro rata* dividend to Class II Allowed General Unsecured Claims shall be made on the earlier of the Distribution Date or shortly after completion of the claims resolution process for objections to Disputed Claims.

        c.      **Class III –Equity Interests.**

Class III shall include all Equity Interests in the Debtors which shall receive no distribution hereunder, and the Equity Interests shall be deemed valueless.

**C.**      **Means for Execution of the Plan**

      1.      <u>Disbursing Agent and Disbursing Agent Reserve</u>

The Disbursing Agent shall be appointed for the purpose of receipt and distribution of all the Distributable Cash. The Disbursing Agent shall establish an interest-bearing escrow account (the "Disbursing Agent Reserve") in which the Distributable Cash shall be maintained for the benefit of creditors. On the Effective Date, the Debtors shall transfer, or cause to be transferred, all Distributable Cash to the Disbursing Agent for distributions hereunder.

      2.      <u>Limitation on Liability of Disbursing Agent</u>

Subject to applicable law, the Disbursing Agent will not be liable for any act he may do or omit to do as Disbursing Agent hereunder while acting in good faith and in the exercise of his reasonable business judgment; nor will the Disbursing Agent be liable in any event except for his own gross negligence, willful fraud or willful misconduct. The foregoing limitation on liability also will apply to any Person employed by the Disbursing Agent and acting on behalf of the Disbursing Agent in the fulfillment of the Disbursing Agent's duties hereunder.

**D.**     **Procedure for Determination of Claims**

1.     Objections to Claims

The Debtors may object to the allowance of any Claim against the Debtors or seek estimation thereof on any grounds permitted by the Bankruptcy Code by filing an appropriate pleading or objection in the Bankruptcy Court at any time prior to the Confirmation Date whereupon said Claim shall be deemed disputed for purposes of the Joint Plan.

2.     Treatment of Disputed Claims

No payments or other distributions shall be made to holders of a Disputed Claim(s) unless and until such Disputed Claim(s) becomes Allowed Claims pursuant to a Final Order. If a Claim is not an Allowed Claim on the Distribution Date or when payment is otherwise due under the Joint Plan, payment of the Disputed Claim will be made when the Disputed Claim becomes an Allowed Claim.  At the time of distributions to holders of Allowed General Unsecured Claims in Class II, an amount sufficient to have paid each holder of a Disputed Claim its *Pro Rata* share of Distributable Cash shall be reserved (the "Disputed Claim Reserve") for the potential benefit of the holder of the Disputed Claim, and thereafter distributed as set forth above, but in the event that a Creditor asserts duplicative, overlapping, or multiple Claims, the total amount reserved shall not reflect any duplication, but shall be in a single amount consistent with the treatment above.  Any unused portion of the Disputed Claim Reserve shall be redistributed to other Allowed General Unsecured Claims to the extent practical, or, in the event the Disbursing Agent deems it impractical, shall be donated to two recognized Jewish charities selected by the Disbursing Agent in consultation with the Committee.

3.      Settlement of Claims.

The Debtors, with the Committee's consent, or the Committee acting alone, shall be authorized to settle Disputed Claims based on a distribution of less than $25,000 without first having to seek approval from the Bankruptcy Court. Any settlement by the Debtors as consented to by the Committee, or made by the Committee alone, involving a distribution of less than $25,000 shall be conclusively deemed to be in the best interests of the Estates.  Settlement of Disputed Claims involving a distribution of more than $25,000 shall require Bankruptcy Court approval upon notice to the Debtors' twenty (20) largest creditors pursuant to Bankruptcy Rule 9019(a).  In the event funds are donated to charities pursuant to this provision, the Debtors shall, in their application for a final decree, identify the charities and provide an affidavit regarding the disinterestedness of the Debtors' principal in said charities.

4.      Post-Effective Date Professional Compensation and Reimbursement Claims

The Committee shall act as an oversight committee with respect to any allowable, authorized or otherwise permissible Professional Compensation and Reimbursement Claims incurred by any Debtors' or Committee's Professionals after the Confirmation Date.  Post-Confirmation compensation approved by the Committee shall be paid without the need for an order of the Bankruptcy Court.   In the event the Committee declines to approve Post-Confirmation compensation sought by the Debtors' or Committee's Professionals, the Professionals may file an application to the Bankruptcy Court for allowance of such compensation.

E.      **Treatment of Executory Contracts**

1.      Background.   The Debtors believe that all executory contracts and unexpired leases were either assumed or assigned, or rejected, during the pendency of the Chapter

11 cases.  However, out of an abundance of caution, the Joint Plan provides for the treatment of any residual executory contracts which may exist.

      2.    <u>Executory Contracts and Unexpired Leases</u>.  Any pre-petition executory contracts or unexpired leases which have not been assumed and assigned, or rejected, prior to the Confirmation Date shall be deemed rejected as of the Effective Date. Any Creditor asserting a claim for monetary damages as a result of the rejection of an executory contract pursuant to the Confirmation Order shall file a Proof of Claim substantially in the form of Official Form 410 with the Claims Agent (a "Rejection Claim"), and serve it upon Debtors' counsel by overnight mail within ten (10) business days following the Effective Date. Nothing herein shall be deemed to extend any Bar Date applicable to a previously rejected executory contract or unexpired lease.

      3.    <u>Rejection Claims</u>.    If a Rejection Claim is not timely filed pursuant to Section 8.2 of the Joint Plan, such Claim, if any, shall be forever disallowed and barred. If one or more Rejection Claims are filed pursuant to Section 8.2 of the Joint Plan, the Debtors may file one or more objections to any Rejection Claims and serve it upon the Claimant and the Claimant's counsel, if any. If a Rejection Claim becomes Allowed, in full or in part, such Claim shall be a Class II General Unsecured Claim to the extent such Claim becomes Allowed and thereby eligible for a distribution hereunder.

**F.    Other Provisions**

      1.    <u>Term of Injunctions or Stays</u>.

      All injunctions or stays pursuant to section 105 or 362 of the Bankruptcy Code shall remain in full force and effect until the close of the Chapter 11 Cases. Except as otherwise expressly provided in the Joint Plan or to the extent necessary to enforce the terms and conditions of the Joint Plan, all Creditors who have held, hold, or may hold Claims against the Debtors, are

permanently enjoined, on and after the Confirmation Date, from (i) commencing or continuing in any manner, any action or other proceeding of any kind with respect to any such Claim; (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or Order against the Debtors, on account of any such Claim; (iii) creating, perfecting or enforcing any encumbrance of any kind against the Debtors; and (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors, or against the property or interests in property of the Debtors, except to the extent such right is asserted in connection with a timely filed proof of claim.

2.  <u>Exculpation</u>

To the extent allowed by Section 1125(e) of the Bankruptcy Code, the Debtor's and Committee's Professionals will not have nor incur any liability to any Holder of a Claim or Interest, or any other party-in-interest,  or any of their respective agents, employees, representatives, financial advisors, attorneys, affiliates or any of their successors or assigns, for any act or omission occurring after the Petition Date and in connection with, relating to, or arising out of the Chapter 11 Case, formulation, negotiation or implementation of the Joint Plan, solicitation of acceptances of the Joint Plan, the pursuit of Confirmation of the Joint Plan, the consummation of the Joint Plan, Confirmation of the Joint Plan, or the property to be distributed under the Joint Plan except for their bad faith, willful malfeasance, reckless disregard of duty, gross negligence, willful fraud, willful misconduct, self-dealing or breach of fiduciary duty.

3.  <u>No Further Pursuit of Avoidance Actions</u>

The Debtors' estates do not intend to bring or commence any further Avoidance Actions against any parties, persons or entities, including insiders.   Given the

uncertainty, time and expense involved of additional litigation, the Committee believes that pursuit of Avoidance Actions is not cost effective.

4.      <u>Dissolution of Debtors</u>

As soon as reasonably practical after the entry of the Final Decree, the Debtors shall be authorized to take all actions necessary to effect the dissolution of the Debtors, whereupon the existing managers, members, officers and directors of the Debtors shall cease to serve in these capacities. The Disbursing Agent, in consultation with the Committee, shall be authorized to retain an accounting firm to prepare and file final federal and state tax returns on behalf of each of the Debtors.

5.      <u>Modification of The Joint Plan</u>

The Joint Plan may be modified by the Debtors and the Committee from time to time in accordance with, and pursuant to, Bankruptcy Code section 1127. The Joint Plan may be modified by the Debtors and the Committee at any time before the Effective Date provided that the Joint Plan, as modified, meets the requirements of Bankruptcy Code sections 1122 and 1123, and the Debtors and the Committee have complied with Bankruptcy Code section 1125.

6.      <u>Closing of the Case</u>

At such time as the estates have been fully administered (<u>i.e.,</u> when all things requiring action under the Joint Plan have been done, and the Joint Plan has been substantially consummated), the Debtors shall seek entry of a Final Decree closing the Cases.

7.      <u>Payment of Statutory Fees and Filing of Quarterly Reports</u>

All fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at or in conjunction with the Confirmation Hearing, will be paid on or before the Effective Date and, thereafter, pending entry of a final decree. All quarterly reports of

disbursements required to be filed by applicable bankruptcy law will be filed in accordance with applicable bankruptcy law. The UST will continue to be paid by the Debtors until entry of the final order or decree, or upon conversion or dismissal of the Bankruptcy Case.

## G.    Retention Of Jurisdiction

Notwithstanding Confirmation of the Plan and the occurrence of the Effective Date, the Bankruptcy Court will retain jurisdiction for the following purposes:

Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the priority, amount, or allowance of Claims;

Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for Professional Compensation;

Ensure that distributions to holders of Allowed Claims are effectuated pursuant to the provisions of the Joint Plan;

Adjudicate any motions, adversary proceedings, applications or contested matters that may be pending on the Effective Date;

Enter and implement such Orders as may be necessary or appropriate to execute, implement, enforce or consummate the provisions of the Joint Plan.

Adjudicate any and all disputes arising from or relating to distributions under the Joint Plan or any transactions contemplated herein;

Consider any modifications of the Joint Plan to cure any defect or omission, or to reconcile any inconsistency with the Confirmation Order; and

Enter an Order concluding or closing the Chapter 11 Cases.

## V.     CONFIRMING THE PLAN

### A.     Parties in Interest Entitled to Vote

Any Holder of a Claim against the Debtors whose Claim has not been Disallowed previously by the Bankruptcy Court, is entitled to vote to accept or reject the Joint Plan if such Claim is impaired under the Joint Plan and either (a) such Holder's Claim has been scheduled by the Debtor and is not scheduled as disputed, contingent or unliquidated, or (b) such Holder has filed a proof of Claim before the Bar Date.

Pursuant to section 1124 of the Bankruptcy Code, a class of claims is "impaired" if the Plan alters the legal, equitable or contractual rights of the Holders of such Claims. In this case, Class II General Unsecured Claims are impaired by the Plan and have the right to vote. Class III Equity Interests are impaired by the Plan, but such Class is presumed to reject the Plan and, accordingly, is not entitled to vote on the Plan.

Any Claim to which an objection has been filed is not entitled to vote unless the Bankruptcy Court, upon application of the Holder to whose Claim an objection has been made, temporarily allows such Claim in an amount that it deems proper for the purpose of accepting or rejecting the Joint Plan. Any such application must be heard and determined by the Bankruptcy Court on or before the Voting Deadline. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

### B.     Requirements for Confirmation

The Bankruptcy Court will confirm the Joint Plan only if it meets all the requirements of Section 1129 of the Bankruptcy Code. Among the requirements for confirmation are that the Joint Plan be: (a) accepted by all impaired classes of Claims and Equity Interests that are entitled to vote

or, if rejected by an impaired class, that the Joint Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to such class; (b) feasible; and (c) in the "best interests" of creditors impaired under the Plan. The Bankruptcy Court must also find that:

- The Joint Plan has classified Claims and Equity Interests in a permissible manner;

- The Joint Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and

- The Joint Plan has been proposed in good faith.

1.    <u>Classification of Claims and Interests</u>

Section 1122 of the Bankruptcy Code requires the Joint Plan to place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such class. The Joint Plan creates separate classes to deal respectively with secured claims, unsecured claims and equity interests. The Debtors and the Committee believe the Joint Plan's classifications place substantially similar Claims or Equity Interests in the same class and, thus, meet the requirements of section 1122 of the Bankruptcy Code.

2.    <u>Voting and Acceptance of the Joint Plan</u>

As a condition to confirmation of the Joint Plan, the Bankruptcy Code requires each class of "impaired" Claims or Equity Interests entitled to vote on the Plan to vote to accept the Joint Plan. The Bankruptcy Code defines acceptance of a plan by a class of Creditors as acceptance by Holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of those claims actually voting. Acceptance of the Joint Plan by a class of equity interests is defined as acceptance by Holders of two-thirds (2/3) of the number of shares actually voting. Holders of Claims who fail to vote

will not be counted as either accepting or rejecting the Joint Plan. A vote, moreover, may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that it was not made or solicited in good faith.

3.      Best Interests Test

The "best interests" of creditors test requires that each Holder of a Claim or Equity Interest receive or retain under the Joint Plan property of a value that is not less than the value such Holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code. To determine what members of each impaired Class of Claims and Equity Interests would receive if the Debtor were liquidated, the Bankruptcy Court must determine the dollar amount that a liquidation of the Debtor's assets would generate in the context of a Chapter 7 liquidation sale. The amount available for satisfaction of Claims and Equity Interests would consist of the net proceeds resulting from the sale of the Debtors' assets, and the costs and expenses of the liquidation.

Because the Joint Plan is a plan of orderly liquidation, each Class of Creditors and Equity Interests will receive substantially the same treatment it would receive if the Debtors' assets were liquidated pursuant to Chapter 7 of the Bankruptcy Code, except that the Estates will neither be taxed with the additional expenses and commissions of a trustee nor delayed by a trustee's appointment and need to become familiar with the matter. Accordingly, the Debtor and the Committee believe the Joint Plan satisfies the "best interests" of creditors test.

4.      The Feasibility Test

The "feasibility" test requires the Bankruptcy Court to find that confirmation of the Joint Plan is not likely to be followed by the liquidation or the need for further reorganization of the Debtor. Because the Debtor already has ceased operations and the Joint Plan contemplates an orderly

liquidation of the Debtors' assets, confirmation of the Joint Plan will not be followed by a liquidation or further reorganization.

5.      Requirement for Accepting Class

Section 1129(a)(8) and (10) together require that at least one class of impaired creditors vote to accept the Plan.  In this case, Class II, general unsecured creditors, is the only impaired Class.  **Accordingly, the Plan cannot be confirmed unless general unsecured creditors vote to accept the Plan.**

In the event the Plan is not confirmed, the only viable alternative is the conversion of the case to Chapter 7, and the appointment of a trustee.  Since all of the assets have already been liquidated, conversion will result in delay and additional administrative cases, reducing the amount available to distribution to Class II creditors.  Therefore, the Debtors and the Committee urge all creditors to vote to accept the Plan as the most expeditious manner to make the maximum possible distribution to creditors.

6.      Other Requirements of Section 1129

The Joint Proponents believe that the Plan meets all the other technical requirements of section 1129 of the Bankruptcy Code, including that the Joint Plan has been proposed in good faith.

## VI.    **RECOMMENDATION AND CONCLUSION**

The Debtors and the Committee believe the Joint Plan provides the best available alternative for maximizing the recoveries that Creditors may receive from the Estate. Therefore, the Debtors and the Committee recommend that all Creditors that are entitled to vote on the Joint Plan vote to accept the Joint Plan.

Dated: October 30, 2020

Zeichner Ellman & Krause LLP
*Counsel to the Debtors and*
*Debtors in Possession*
1211 Avenue of the Americas
New York, New York 10036

By:     /s/ Nathan Schwed
        Nathan Schwed, Esq.

SEASONS CORPORATE LLC, et al
*Debtors and Debtors-in-Possession*


By:     /s/ Joel Getzler
        Joel Getzler, Co-CRO

4843-8124-8968, v. 1

Goldberg Weprin Finkel Goldstein, LLP
*Counsel to the Official Committee of*
*Unsecured Creditors*
1501 Broadway, 22nd Floor
New York, New York 10036

By:     /s/ Kevin J. Nash
        Kevin J. Nash, Esq.